UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-60223-RAR

**UNITED STATES OF AMERICA**

vs.

**VERAN ANDREW,**

        **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

THIS CAUSE comes before the Court on Defendant Veran Andrew's Motion to Suppress Physical Evidence ("Motion") (DE 24), which has been referred to me by the Honorable Rodolfo A. Ruiz, II. (DE 34). The Motion seeks to suppress physical evidence seized from the Defendant's automobile on May 23, 2021. I have reviewed the Motion and the Government's Response. (DE 28).[1] On January 13, 2022, I held an evidentiary hearing at which the parties presented testimony, evidence, and arguments on the Motion. Being fully advised in the premises, I respectfully **RECOMMEND** that the Motion be **DENIED**.

    **I.**    **FINDINGS OF FACT**

Based on the testimony and evidence presented at the evidentiary hearing on January 13, 2022, I make the following findings of fact. The evidence presented consisted of the testimony of Coconut Creek Police Department ("CCPD") Detective Christopher Lewis,[2] as well as audio and video recordings from Detective Lewis's vehicle dashboard camera ("dashcam"), photographs taken during a search of the Defendant's vehicle, and other exhibits described below. My

---

[1] The Defendant did not file a Reply.

[2] At the time of the events at issue, Detective Lewis was a road patrol officer. He has since become a detective. For consistency's sake, I refer to him as "Detective" throughout.

findings of fact are based, in part, on credibility determinations, having observed Detective Lewis's testimony in conjunction with the other evidence submitted, as discussed more fully below.

On May 23, 2021, Detective Lewis was on road patrol. As a road patrol officer, his duties were to respond to emergency calls and proactively enforce traffic laws or otherwise prevent criminal activity. Around 2:16 p.m., he was stopped at a stop light at the intersection of Lyons Road and Atlantic Boulevard, facing north in a thru-traffic lane. In his rearview mirror, he observed the Defendant approaching the intersection driving a tan Chevrolet sedan. The Defendant's vehicle came from behind and to the left of Detective Lewis's vehicle and passed next to Detective Lewis's vehicle on the left in one of the two left-turn lanes. As the Defendant's vehicle approached from behind, Detective Lewis had an unobstructed view into the Defendant's vehicle through the Defendant's front windshield. From his view in the rearview mirror, Detective Lewis observed that the Defendant was not wearing his seatbelt. Specifically, he saw that the seat belt buckle was hanging from the "B pillar" over the Defendant's left shoulder. As the Defendant's vehicle passed Detective Lewis's vehicle, Detective Lewis could similarly see in through the Defendant's passenger-side window that the Defendant was not wearing his seatbelt.[3]

Detective Lewis observed the Defendant maneuver from the outer left-turn lane (the one immediately adjacent to Detective Lewis's lane) into the inner left-turn lane, crossing a solid white traffic control line in the process. Detective Lewis began to maneuver his own vehicle into the left-turn lanes in order to eventually get behind the Defendant. Detective Lewis observed the Defendant see the Detective's patrol car at some point, and Detective Lewis observed the Defendant reach for the dangling seatbelt buckle.

---

[3] The Defendant argues that there is insufficient evidence to support Detective Lewis's testimony that he observed the Defendant not wearing a seatbelt. I discuss my reasons for crediting Detective Lewis's testimony further below.

After both vehicles turned left onto Atlantic Boulevard, Detective Lewis initiated a traffic stop, activating his emergency lights.  Activating his emergency lights also activated his vehicle's "dashcam," which recorded the view facing out the Detective's front dashboard window, as well as a wireless microphone attached to the Detective's uniform.  The Defendant stopped on the side of Atlantic Boulevard, eventually pulling into a right-turn lane on the Detective's instructions.  The Detective ran a check of the Defendant's vehicle tag, which would have advised him that the Defendant had a pending narcotics charge; however, the Detective did not run a warrant check for the Defendant until later, after the Defendant was arrested.

The Detective approached the passenger side of the Defendant's vehicle, next to the curb, and spoke to the Defendant through the open passenger side front window.  The Detective immediately identified himself and told the Defendant that he had been stopped for failing to wear his seatbelt back at Atlantic and Lyons (though the Detective also noted that he saw the Defendant subsequently put on the seatbelt).  (Government's Exhibit 1A).  The Detective asked the Defendant for his license, registration, and insurance.  He spoke to the Defendant for approximately one minute, as the Defendant initially handed the Detective an EBT card instead of a driver's license and the Detective asked about proof of insurance.  *Id*.

During this initial exchange, Detective Lewis had a clear view into the Defendant's vehicle, standing right at the open passenger window.  He observed the Defendant looking around and moving around within the car, reaching around various parts of the car including the gear shift.  The Defendant stated he was nervous, and the Detective observed him sweating profusely.  While the Detective inspected his license, the Defendant asked, "Am I good?", which the Detective interpreted as the Defendant trying to distract him or detour him from what he was doing.

Detective Lewis testified that while asking the Defendant for his license, he was observing the Defendant intently and looking around the vehicle for signs of contraband or weapons. He observed loose marijuana on the front passenger floorboard along with a broken glass pipe or stem with black burn marks. Detective Lewis recognized from experience the broken pipe as one commonly used to smoke crack cocaine (and the burn marks were consistent with such use). Detective Lewis also detected the distinct, pungent odor of marijuana. The Detective also observed small plastic baggies in various parts of the vehicle, including the center console and the front seat, which he recognized as those commonly used to package narcotics.

Within a few minutes of the traffic stop beginning, a back-up officer joined Detective Lewis. Believing he had probable cause to search the vehicle (based on seeing and smelling marijuana, as well as observing the broken pipe and baggies), and concerned about the Defendant's nervousness and movements, Detective Lewis sought to have the Defendant get out of the vehicle. Detective Lewis went around to the driver's side and asked the Defendant for his keys. (Government's Exhibit 1C). Once the Defendant provided his keys, Detective Lewis placed them on the vehicle's roof and asked the Defendant to place other items up on the dashboard. *Id*. When the Defendant moved to get out of the vehicle, the Detective told him to stay where he was and then warned the Defendant that he would be tased if he did not do exactly as the Detective instructed. (Government's Exhibit 1D). The Detective testified that he gave this warning because the Defendant was not following his instructions (although it is unclear how exactly the Defendant was not complying, especially given how brief the interaction at the driver door was). Soon thereafter, the Defendant pushed passed the Detective and ran out into traffic. *Id*. The Detective and his backup officer pursued him, tased him, and subdued him after a struggle (during which they tased the Defendant a second time).

Once the Defendant was placed under arrest (for resisting arrest without violence, a misdemeanor), Detective Lewis called a tow truck to impound the Defendant's vehicle.[4] Detective Lewis then searched the vehicle. During that search, Detective Lewis found two plastic bags containing fentanyl in a compartment by the steering wheel (Government's Exhibit 2G), a small bag of cocaine, empty plastic baggies, and an AK-47 style pistol. (Government's Exhibit 2I). The firearm was located on the floorboard behind the front passenger seat, underneath a sweater. (Government's Exhibit 2H). The Detective also photographed small pieces of marijuana that he found but were too insubstantial to seize as evidence. He photographed flecks of marijuana on the front floorboard (Government's Exhibits 2B and 2C) and in the crease of the front passenger seat (Government's Exhibits 2D). He also photographed the broken pipe that he had observed earlier (Government's Exhibit 2E), though he testified that (unlike in the photograph) the pipe was initially located partially under a sandal on the passenger-side floorboard. Detective Lewis explained that he had been able to see the pipe originally because the sandal was propped on top of a box and he had a side view. The photographs do not show plastic baggies throughout the car, other than one that was partially visible under a receipt in the center console. (Government's Exhibit 2F). However, there is a photograph of more than two dozen baggies together on the front passenger seat. (Government's Exhibit 2J). Detective Lewis testified that he collected the baggies from throughout the car and compiled them together on that seat for the photograph. He also emphasized that the various photographs he took during the search (and submitted into evidence by the Government) were taken after some searching had occurred and after some items had been moved to create clearer pictures.

---

[4] A CCPD policy allows an officer to tow a vehicle from public property when drivers are arrested (Government's Exhibit 3 at 10-11) and requires officers towing a vehicle to remove and inventory items of value from the vehicle prior to towing. *Id.* at 11-12.

II.   ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The Defendant argues that Detective Lewis violated the Fourth Amendment in two ways: (1) that Detective Lewis lacked reasonable suspicion or probable cause for initially stopping (and, therefore, seizing) the Defendant in his vehicle because the Defendant had not committed any traffic infractions; and (2) that Detective Lewis lacked probable cause to search the vehicle because the vehicle did not contain any marijuana or a broken pipe and did not smell like marijuana. Based on my credibility and factual findings above, I conclude that Detective Lewis had probable cause for the initial stop and probable cause to search the vehicle. Therefore, the motion should be denied.

A. Initial Stop

"A traffic stop for a suspected violation of law is considered a seizure of the vehicle's occupant and must be conducted in accordance with the Fourth Amendment." *United States v. Braddy*, 11 F.4th 1298, 1308 (11th Cir. 2021) (citing *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). "A traffic stop constitutes an unreasonable seizure unless it is supported by reasonable suspicion of criminal activity or probable cause that a traffic violation has occurred." *United States v. Andres*, 960 F.3d 1310, 1317 (11th Cir. 2020) (citing *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008)).

Detective Lewis had probable cause to believe that the Defendant had committed a traffic violation based on his observations that the Defendant was driving without wearing a seatbelt. *See* Fla. Stat. 316.614 ("It is unlawful for any person . . . (b) To operate a motor vehicle or an

autocycle in this state unless the person is restrained by a safety belt.").[5] At the hearing, the Defendant conceded that, if credited, Detective Lewis's testimony regarding his observations of the Defendant not wearing a seatbelt would amount to probable cause for this violation. The Defendant's primary argument for rejecting Detective Lewis's testimony regarding this seatbelt violation, and thus finding that there is no evidence that a seatbelt violation occurred, is that there is no dashcam or other video evidence showing the Defendant not wearing his seatbelt. However, the lack of video footage corroborating Detective Lewis's testimony does not undermine Detective Lewis's credibility or provide a reason for rejecting his testimony.

As Detective Lewis credibly testified, his dashcam does not activate until after he activates his emergency lights. Thus, his dashcam here did not begin recording until after he had observed the seatbelt violation and decided to initiate the traffic stop. The fact that the dashcam does not show whether the Defendant wore his seatbelt after it activated also sheds no light on what Detective Lewis saw before he activated his lights because Detective Lewis had a different view. Detective Lewis could see into the Defendant's vehicle via his rearview mirror as the Defendant approached from behind Detective Lewis's vehicle and could see into the Defendant's vehicle as that vehicle passed to the side of the Detective's vehicle.

In the absence of any video corroborating or undermining the Detective's testimony about what he observed, I have considered other factors in assessing Detective Lewis's credibility. Specifically, based on the uncontroverted testimony, the Detective had a clear view into the Defendant's car both as it approached and passed the Detective. The dashcam video does show

---

[5] On cross-examination, the Defendant confronted Detective Lewis with a citation he had issued to the Defendant, citing the Defendant with an "improper lane change," under Fla. Stat. 316.085-2. Following the cross-examination, the Government essentially conceded that the conduct described by Detective Lewis did not violate this particular traffic regulation. However, because Detective Lewis possessed probable cause to believe that the seat belt violation occurred, the traffic stop was justified even if he improperly issued a citation for a different violation later. *See*, *e.g.*, *United States v. Eckhart,* 569 F.3d 1263, 1271 (10th Cir.2009).

that the incident occurred on a clear, sunny afternoon, and the Defendant would likely have been going slow enough (approaching a stop light and left turn with other cars in the area) for the Detective to see well.  Furthermore, once the Detective approached the Defendant's stopped vehicle, the Detective immediately told the Defendant that he had stopped the Defendant for failing to wear his seatbelt, indicating that the Detective either had actually seen the seatbelt violation or had a pre-formed plan to invent a seatbelt violation as an excuse for the stop.  Yet I see no evidence supporting the latter explanation as a credible one.  Considering these facts, as well as having observed the Detective's demeanor during testimony, I find his testimony that he observed the Defendant not wearing a seatbelt credible.

Having found Detective Lewis's testimony that he observed the Defendant driving without wearing a seatbelt credible, it is clear that Detective Lewis had probable cause to stop the Defendant's vehicle.

B. <u>Search of the Vehicle</u>

The Defendant also argues that, even if the initial stop of his vehicle was justified, there was no probable cause to search his vehicle.  The Government contends that there was probable cause to search the vehicle based on Detective Lewis detecting a strong odor of marijuana from the vehicle and observing loose marijuana throughout the vehicle, a broken crack pipe on the floorboard, and numerous small plastic bags.  The Defendant does not contest that such observations, if true, would amount to probable cause supporting a search of the vehicle.  Rather, the Defendant disputes whether the Detective actually observed this odor and these items.

Again, I find Detective Lewis's testimony credible based on my observations of his testimony.  The Detective testified that he was able to detect the distinct pungent odor of marijuana while standing at the open passenger window at the beginning of the traffic stop.  The

photographs showing some (albeit very small amounts of) marijuana on the passenger seat and floorboard corroborate that testimony. The Defendant attacks the Detective's credibility regarding his observations of marijuana in two ways. First, the Defendant sought to impeach Detective Lewis with the Detective's testimony from the Defendant's pretrial detention hearing that he did not see marijuana in the vehicle. Second, the Defendant asserts that the small flecks of marijuana pictured in the Government's photographs are too small for the Detective to have seen and recognized them and too minute to produce a detectable odor.

As to the first argument, although the Detective offered some conflicting statements about whether he saw marijuana, considering his testimony as a whole,[6] these statements do not undermine his assertion that he did see at least small amounts of marijuana and do nothing to undermine his consistent testimony that he smelled it. As to the second argument, I find that while the photographs only show small flecks of marijuana, they are consistent with marijuana having been present in the vehicle (and potentially in larger amounts at some earlier point). Moreover, I find it reasonable that, having been alerted to the possible presence of marijuana by odor (about which Detective Lewis testified consistently), the Detective would have been more attuned to looking for and noticing small amounts that he might not have noticed otherwise. In short, I find the Detective's testimony about his observations of the smell and presence of marijuana (in addition to the plastic baggies and pipe, also corroborated by photographs) to be credible.

---

[6] Detective Lewis's initial pretrial detention hearing testimony was consistent with his testimony at the motion to suppress hearing, indicating that he could smell marijuana as he got close to the vehicle (DE 20 at 21-22) and that he saw loose marijuana inside the vehicle, along with bags and a broken crack pipe stem. *Id*. at 22. He was later asked whether he saw marijuana in the car (answering "no, I didn't see any marijuana inside the car at that time"), *Id*. at 23 and to confirm that "no marijuana was seized or seen" (answering, "that's correct"). *Id*. at 29. At the suppression hearing, Detective Lewis explained that he interpreted these latter questions as asking whether he saw a "chargeable" amount of marijuana – i.e. sufficient marijuana to collect as evidence and test while leaving enough remaining to prosecute the Defendant. Because there was only a small amount of loose marijuana scattered through the vehicle, Detective Lewis testified that he did not seize any of it and consequently answered the questions negatively.

Based on these findings, the search of the Defendant's vehicle was reasonable. Although the Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search, there are certain exceptions to this requirement. *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019) (citing *United States v. Watts*, 329 F.3d 1282, 1284 (11th Cir. 2003)). Under the "automobile exception," "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). "For a warrantless search of an automobile to be constitutional, '(1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime.'" *Delva*, 922 F.3d at 1243 (quoting *United States v. Lanzon*, 639 F.3d 1293, 1299-300 (11th Cir. 2011)).

"As to the mobility requirement, the car must simply be operational." *United States v. Alston*, 598 F. Appx. 730, 734 (11th Cir. 2015) (citing *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007)). As to the second element, "probable cause exists to conduct a warrantless search when 'there is a fair probability that contraband or evidence of a crime will be found in the vehicle' under the totality of the circumstances." *Delva*, 922 F.3d at 1243 (quoting *United States v. Tamari*, 454 F.3d 1259, 1261-62 (11th Cir. 2006)). Although ultimately a legal determination, probable cause is "a common-sense assessment based on the factual and practical considerations of everyday life." *United States v. Reeves*, 604 F. Appx. 823, 826-827 (11th Cir. 2015) (citing *United States v. Smith*, 459 F.3d 1276, 1291 (11th Cir. 2006)). Furthermore, "[o]nce probable cause exists to search the vehicle, police may search all parts of the vehicle, and any containers therein, where the object of the search might be found." *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014) (citing *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999)).

Detective Lewis's observations provided probable cause to believe that the vehicle contained contraband or evidence of the narcotics-related crimes. The Eleventh Circuit has held that the smell of marijuana emanating from a vehicle gives rise to probable cause to search the vehicle for marijuana. *See Merricks v. Adkisson*, 785 F.3d 553, 560 n.3 (11th Cir. 2015) ("Moreover, the smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle." (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991)); *see also United States v. Cheeks*, 795 F. Appx. 805, 811-12 (11th Cir. 2019) ("Our precedent makes clear that an officer's level of suspicion rises to the level of probable cause when he detects 'what he [knows] from his law enforcement experience to be the odor of marijuana.'" (quoting *Tobin*)). Observing actual loose marijuana, and a suspected crack pipe and small baggies that are commonly used as packaging for narcotics, in addition to the odor of marijuana, plainly indicated that there was a fair probability the vehicle contained contraband. Moreover, there is no dispute that the automobile was operational. Therefore, law enforcement was permitted to conduct a warrantless search of the vehicle for evidence of marijuana possession or other narcotics-related crimes.[7]

### III. CONCLUSION

For the foregoing reasons, I respectfully RECOMMEND that the Defendant's Motion to Suppress (DE 24) be **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge. Failure to timely file objections shall bar the

---

[7] The Government also argued that the firearm and narcotics at issue would have been inevitably discovered during a lawful inventory search of the vehicle in conjunction with towing the vehicle following the Defendant's arrest. *See* DE 28 at 7-10 (citing, *inter alia*, *Nix v. Williams*, 467 U.S. 431, 444 (1984) and *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976)). Having found that probable cause justifying the search accrued prior to the Defendant's arrest, I do not address whether the combination of the inevitable discovery doctrine and the inventory search exception to the warrant requirement would avoid suppression absent such probable cause.

parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 19th day of January, 2022.

/s/ Jared Strauss
JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE